Ronnie HALE, Appellant

v.

CDR OPERATIONS, INC.,
et al., Appellees

CDR Operations, Inc., et al.,
Cross Appellants

v.

Ronnie Hale, et al., Cross Appellees

2014–SC–000062–WC
2014–SC–000066–WC

Supreme Court of Kentucky.

RENDERED: OCTOBER 29, 2015

COUNSEL FOR APPEL-
LANT/CROSS–APPELLEE, RONNIE
HALE: McKinnley Morgan

COUNSEL FOR CROSS–APPELLEE,
WORKERS' COMPENSATION BOARD:
Dwight Taylor Lovan

COUNSEL FOR APPELLEE/CROSS–
APPELLANT, CDR OPERATIONS,
INC.: Guillermo Alfredo Carlos, James
Burke Cooper

COUNSEL FOR AMICUS CURIAE:
Eric M. Lamb

## OPINION OF THE COURT BY JUSTICE BARBER

Appellant/Cross–Appellee, Ronnie Hale
was employed by Appellee/Cross–Appel-
lant, CDR Operations, Inc., for approxi-
mately three months as a bulldozer opera-
tor. Before that, Hale had worked as a
bulldozer operator for various other em-
ployers for approximately 30 years. Hale
filed a workers' compensation claim
against CDR alleging cumulative trauma
and an injury date of February 7, 2012.
The parties subsequently stipulated that
date at the Benefit Review Conference
("BRC"). Relying on Dr. Madden, the
administrative law judge ("ALJ") conclud-
ed that Hale sustained cumulative trauma
injuries which became manifest on Febru-
ary 7, 2012, while he was employed at
CDR, and that he was permanently and
totally disabled. Although the Workers'
Compensation Board ("Board") noted that
the ALJ's determination was consistent
with Dr. Madden's opinion, it vacated and
remanded, concluding that February 7,
2012, could not be the date of manifesta-
tion and that *Southern Kentucky Concrete
Contractors, Inc. v. Horace W. Campbell*,
662 S.W.2d 221 (Ky.App.1983), required
apportionment of liability based upon the
percentage of Hale's impairment attribut-
able to the three months he worked at
CDR. The Court of Appeals affirmed.
Hale appealed and contends that *Southern
Kentucky Concrete* is inapplicable. CDR
cross-appeals and contends that the evi-
dence failed to establish that Hale sus-
tained a cumulative trauma injury during
his three-month employment there.

For the reasons set forth below, we
affirm to the extent that Dr. Madden's
opinion provides a sufficient evidentiary
foundation to support the ALJ's award.
We reverse with respect to the issues of
the manifestation date and apportionment
of liability and reinstate the ALJ's deci-
sion.

## I. BACKGROUND

On April 16, 2012, Hale filed an Applica-
tion for Resolution of Injury Claim (Form
101), alleging cumulative trauma to his
neck and back and an injury date of Feb-
ruary 7, 2012.[1] Hale had worked as a

---

1. Hale subsequently amended his cumulative    trauma claim to include injuries to his knees,

dozer operator for various employers over approximately 30 years, most recently for CDR from November 2011 through February 7, 2012. Before that, he worked for Ikerd Bandy from 2001 until November 2011.

In his June 20, 2012 deposition, Hale explained that he stopped working for Ikerd because CDR bought it out, then CDR ceased operation. Hale testified that he worked for CDR at Redbird Mine in Clay County. He operated a dozer removing spoil off the top of the coal. The dozer had an air seat which, according to Hale, "was broke." On February 7, 2012, the job at Redbird ended and Hale was laid off.

At the September 6, 2012, BRC, the parties stipulated that "[Hale] sustained work-related injury(ies) on *2–7–12 (alleged)*." The BRC Memorandum and Order lists the contested issues as: "Extent/duration; Notice & occurrence/causation; exclusion of any active or non-work related conditions; credit for any unemployment benefits[;] whether plaintiff sustained an injury, TTD & meds, multipliers[.]" The date of manifestation was not listed as a contested issue.

At the December 12, 2012 hearing, Hale testified that, over the past 30 years, his jobs included running a dozer, an excavator and a loader. He stated the dozer was the most physically demanding. At CDR, Hale worked on rough terrain with a lot of jarring and bouncing. He "mostly broke down the shot after the-the dynamite was put off.... Most of the time it leaves pretty big boulders....." Hale had to "push them out of the way ... so the smaller material, the loader can get to...." Hale worked every day that he

was employed by CDR until the job ended. He testified that Dr. Madden was the first person who told him that he had a work-related problem caused by years of operating heavy equipment.

On December 17, 2012, the ALJ rendered an Opinion and Order which recites that the parties had stipulated an ("alleged") injury date of February 7, 2012.[2] The ALJ found Hale credible and convincing, determined that notice was timely under KRS 342.185, and concluded that Hale was permanently and totally disabled:

Based upon the totality of the evidence, including the plaintiffs sworn testimony and the medical reports and deposition of Dr. Madden, which I found to be very persuasive, I make the factual determination that Mr. Hale sustained cumulative trauma to his neck and back and also to both upper extremities and his left lower extremity and his right lower extremity as a result of working for a long period of time in the operation of heavy machinery and in the mines. I make the factual determination that there is sufficient reliable probative evidence in the record to support the finding that Mr. Hale's permanent impairment and occupational disability occurred during his lifetime of employment in the operation of heavy equipment and in the coal mines, and that his painful conditions manifested themselves on or about February 7, 2012, when he was employed by CDR Operations, Inc.

This case is like unto [sic] *Southern Kentucky Concrete Contractors, Inc. v. Campbell,* 662 S.W.2d 221 (Ky.App. 1983). Mr. Campbell was employed by

right foot and white-knuckle syndrome/chronic vibration injury.

2. The ALJ's Opinion also lists the contested issues which are the same as contained in the BRC Memorandum and Order. The date of manifestation was not a contested issue.

Southern Kentucky at the time his back pain manifested itself. Mr. Campbell had worked for many years doing heavy labor, primarily as a concrete worker for a number of companies. The [old] Workers' Compensation Board found that there was sufficient reliable probative evidence in the record to show that Mr. Campbell suffered a permanent total occupational disability that occurred over his lifetime of employment as a manual laborer and that this condition manifested itself while he was employed by Southern Kentucky Concrete.

The ALJ was not persuaded that Hale had any prior active disability, citing *Roberts Brothers Coal Company v. Robinson*, 113 S.W.3d 181 (Ky.2003).[3] The ALJ explained that although Hale "had previous injuries and painful spinal symptoms," he was working without any restrictions while he was employed by CDR.

The ALJ awarded PTD benefits against CDR and/or its workers' compensation insurer beginning on February 7, 2012 continuing for the duration of Hale's disability pursuant to KRS 342.730(4).[4]

Both parties sought reconsideration. Hale raised an error in the amount of the weekly benefit rate. CDR contended that the "overwhelming medical testimony would indicate no objective harmful change in the human organism as a consequence of [Hale's] brief three-month employment by CDR." By Opinion and Order on Reconsideration rendered January 14, 2013, the ALJ granted Hale's petition and denied CDR's.

On January 31, 2013, CDR filed Notice of Appeal to the Board. The sole issue CDR raised on appeal was that the evidence failed to support a cumulative trauma injury during Hale's employment at CDR. By Opinion rendered May 17, 2013, the Board noted that the ALJ's determination was "certainly consistent" with Dr. Madden's opinion, but vacated and remanded on other grounds:

> The record reveals February 7, 2012, is the date Hale was laid off from work for reasons unrelated to his alleged injury. This does not comprise a date of manifestation. Therefore, the ALJ's determination Hale sustained a cumulative trauma injury which manifested on February 7, 2012, and the award of PTD benefits must be vacated. On remand, the ALJ must determine the date of

**3.** *Roberts Bros.* explains that when enacting the 1996 amendments, the legislature used different standards for awarding benefits for permanent total disability ("PTD") under KRS 342.730(1)(a) and for permanent partial disability ("PPD") under KRS 342.730(1)(b). PTD awards are based upon a finding of disability, and some of the *Osborne v. Johnson*, 432 S.W.2d 800 (Ky. 1968), factors are still relevant to that determination. By contrast, PPD awards are based upon a finding that the injury resulted in an impairment rating under the AMA Guides, and the PPD benefit amount is determined by statute.

> Impairment and disability are not synonymous. We conclude, therefore, that an exclusion from a [PTD] award must be based upon pre-existing [occupational] disability, while an exclusion from a [PPD] award must be based upon pre-existing impair-

ment [under the AMA Guides]. For that reason, if an individual is working without restrictions at the time a work-related injury is sustained, a finding of pre-existing [AMA] impairment does not compel a finding of pre-existing disability with regard to an award that is made that is made under KRS 342.730(1)(a) [for PTD].

*Id.* at 183.

**4.** KRS 342.730(4) provides in relevant part: "All income benefits payable pursuant to this chapter shall terminate as of the date upon which the employee qualifies for normal old-age Social Security retirement benefits … or two (2) years after the employee's injury or last exposure, whichever last occurs." Hale was 63 years old at the time of the alleged injury.

manifestation of Hale's alleged cumulative trauma injury. . . .

The ALJ also erred in another critical respect. While in claims for hearing loss, KRS 342.7305 causes liability to fall on the last employer, this is not the case with non-hearing loss cumulative trauma claims.

In *Southern Kentucky Concrete Contractors, Inc. v. Horace W. Campbell,* 662 S.W.2d 221, 222 (Ky.App.1983), a case misinterpreted by the ALJ, . . . the claimant's preexisting condition was found to be attributable to "his hard manual labor" with multiple employers over the years of his work life. . . .

In *Southern Kentucky Concrete, supra,* the fact-finder determined "Campbell suffered a permanent, total, occupational disability that occurred during his lifetime of employment as a manual laborer." Similarly, in the case *sub judice,* the ALJ determined "Mr. Hale's permanent impairment and occupational disability occurred during his *lifetime of employment* in the operation of heavy equipment and in the coal mines." (emphasis added). This is certainly consistent with the medical opinions of Dr. Madden upon which the ALJ relied. . . .

. . . .

We acknowledge the ALJ determined Hale "did not have any prior active disability due to other accidents, injuries or conditions." However, this finding clearly does not establish a dormant condition was aroused into disabling reality during Hale's brief employment at CDR. In fact, by finding Hale sustained cumulative trauma over his thirty year history of operating heavy machinery in the mines, the ALJ, by implication specifically rejected the premise Hale's work

at CDR resulted in an arousal of a previously dormant non-disabling condition into disability reality. The ALJ is left, then, with analyzing this as a cumulative trauma claim with multiple employers, and *Southern Kentucky Concrete, supra,* is determinative. As required by *Southern Kentucky Concrete, supra,* the ALJ must determine what percentage of Hale's impairment, *if any,* is directly attributable to Hale's three months at CDR. . . . Simply because Hale was last employed by CDR does not place the entirety of the liability for Hale's alleged permanent and total occupational disability on CDR. There must be evidence of record establishing that Hale's work activities performed during his three months employment with CDR contributed to his overall permanent condition, producing some degree of harmful change to the human organism.

The language in *Southern Kentucky Concrete, supra,* regarding responsibility of the Special Fund is obviously no longer relevant.

Both parties appealed to the Court of Appeals.[5] CDR argued that the ALJ and the Board erred in failing to dismiss Hale's claim, because the medical evidence failed to establish that Hale had sustained a cumulative trauma injury. Specifically, CDR maintained that Dr. Madden could not point to any objective medical findings attributable to the three-month period Hale worked at CDR. Hale argued that the Board substituted its judgment for that of the ALJ and erred in vacating and remanding the ALJ's decision, because the ALJ correctly applied the law to the evidence he found more credible.

---

**5.** Hale subsequently filed a Motion to Consolidate. By Order of August 8, 2013, the motion was granted to the extent that the appeals were assigned to the same panel for consideration on the merits.

By Opinion rendered January 31, 2014, the Court of Appeals affirmed:

[T]he Board reversed entirely appropriately on the grounds that the ALJ had applied the wrong legal standard to the facts: firstly, by choosing as the date of manifestation the day that Hale was laid off, ... and secondly, by assessing all liability ... to CDR, rather than apportioning what percentage of [Hale's] injury, if any, was attributable to his three months of employment there. The Board's reasoning was correct as a matter of law under *Southern Kentucky Concrete Contractor's Inc. v. Campbell*, 622 S.W.2d 221, 222–23 (Ky.App. 1983[1981]), which stands for the proposition that liability should be apportioned to the employer based upon the percentage of disability attributable to the work performed by the employee while in the employ of that company.

The Court of Appeals concluded that Dr. Madden's opinion was sufficient "to support the ALJ's finding that Hale had sustained a cumulative work injury. As to determining the portion that can be attributed to his employment with CDR, the Board left open the possibility that none of Hale's impairment is directly attributable to his employment at CDR."

Hale appeals and contends that *Southern Kentucky Concrete* is inapplicable. CDR cross-appeals and contends that the evidence failed to establish that Hale sustained a cumulative trauma injury during his three-month employment there.

## II. ANALYSIS

### A. Apportionment

In *Southern Kentucky Concrete*, the claimant, a concrete worker, worked for Southern from July 1978, through November 17, 1979. Before that, he had worked approximately 24 years primarily as a concrete worker for other employers. The old Board found that Campbell suffered a permanent, total, occupational disability which occurred during his lifetime of employment as a manual laborer, and that this condition manifested itself in April of 1979. On appeal, the Court held that apportionment of liability was governed by *Haycraft v. Corhart Refractories*, 544 S.W.2d 222 (Ky.1976) and that "Southern shall be liable for that percentage of [the claimant's] disability which is equal to the percentage of [his] worklife spent with Southern. The remainder of his disability is the responsibility of the Special Fund." *Southern Kentucky Concrete* at 222–23.

In *Haycraft*, the Court had to determine "what was meant by the 1972 legislative definition of the word, 'injury,' [in] KRS 342.620(1)." *Id.* at 223. The statute provided that " '[i]njury' means any work related harmful change in the human organism ... but does not include any communicable disease unless the risk of contracting such disease is increased by the nature of the employment. 'Injury' when used generally ... shall include an occupational disease." *Id.* at 224. Previously, "compensation coverage [had been limited] to disabilities 'resulting from traumatic personal injury sustained ... by accident' or from occupational diseases." *Id.* *Haycraft* explained that when the Legislature enacted KRS 342.620(1), it also amended the apportionment statute, KRS 342.120.

Before the 1972 amendment, KRS 342.120(1)(b) provided that liability would be apportioned between the employer and the Special Fund, if a dormant, nondisabling "disease condition" was aggravated or aroused by a work-related injury. *Id.* If the pre-existing condition was not a "disease," the Special Fund was not liable.

For example, in *Young v. City Bus Co.*, 450 S.W.2d 510 (Ky.1969), a non-disabling, pre-existing degenerative disc in itself was

not considered to be a "disease condition" for which the Special Fund was liable under the pre–1972 version of KRS 342.120(1)(b). The Court concluded that "the employer should bear the risk in such situations.... [T]he statutory intent is clear that the employer may pass off part of the risk to the Special Fund only ... where the nondisabling, dormant, pre-existing condition is caused by disease." *Id.* at 515.

In *Central Uniform Rentals v. Richburg*, 468 S.W.2d 268, 272 (Ky.1971), the Court explained that:

> It was stated in City Bus [sic] that a dormant, non-disabling, preexisting degenerative disc in itself is not a disease for which the Special Fund is liable under KRS 342.120. The effect of that conclusion was not that the employee shall go uncompensated with respect to the disability caused by arousal of such a condition. Rather, it was noted that the employer shall be liable under the theory that industry takes the worker as it finds him.

In 1972, the Legislature amended the language in KRS 342.120(1)(b) from "disease condition," to "disease or condition," thus shifting liability to the Special Fund for the portion of disability attributable to a pre-existing, nondisabling condition. *Haycraft*, at 224–25.

> [But] [u]nless the disability was precipitated or 'aroused' by some identifiable or noticeable incident that occurred on the job,... it simply was not compensable, because it was held to have resulted from a normal degenerative process rather than the work. We think now, however, especially in view of the 1972 legislation... [t]hat this view is unrealistic and unnecessarily restrictive.

[J]ust as constant exposure to the dust and dampness of underground coal mining is certain to increase the risk of emphysema and chronic bronchitis, so are the rigors of strenuous manual labor bound to hasten toward its breaking point the debilitating process of a degenerative spinal disc. We are therfore [sic] of the opinion that if it be found, or should be found, that the nature and duration of the work probably aggravated a degenerative disc condition to the degree that it culminated in an active physical impairment sooner than would have been the case had the work been less strenuous, 'to that extent the pre-existing condition is itself an injury as now defined in KRS 342.620(1)....

. . . .

To the extent that the claimant was actively disabled prior to [the date of injury], under KRS 342.120 he cannot be compensated. **For the remainder of his disability attributable to the present condition of his back he is entitled to compensation** to be divided between the employer and the Special Fund, the employer's portion to be assigned not on the basis of how much of it would have occurred in the absence of the degenerative disc condition, but on the basis of how much the work has contributed to it.

*Id.* at 225, 228 (footnote omitted)(emphasis added).

The Legislature has amended KRS Chapter 342 many times since *Haycraft* and *Southern Kentucky Concrete* were decided. Effective October 26, 1987, KRS 342.1202 was enacted, mandating 50–50 apportionment of liability between the employer and the Special Fund in back and heart claims.[6] *Com., Cent. State Hosp. v.*

6. As enacted in 1987, KRS 342.1202 provided:

An award for income benefits for total or partial disability under this chapter based,

*Gray,* 880 S.W.2d 557, 558–59 (Ky.1994) explained that:

> The 1987 Special Session was, in part, an attempt to deal with the escalating and unfunded liability of the Special Fund. At that time KRS 342.1202 was enacted in an apparent response to judicial decisions which had shifted liability from the employer to the Special Fund, particularly in cumulative trauma and gradual injury cases as well as in heart attack cases. *Haycraft v. Corhart Refractories,* Ky., 544 S.W.2d 222 (1976); *Wells v. Boyd,* Ky.App., 715 S.W.2d 906 (1986); *Southern Kentucky Concrete Contractors, Inc. v. Campbell,* Ky.App., 662 S.W.2d 221 (1983); *OK Precision Tool & Die v. Wells,* Ky., 678 S.W.2d 397 (1984); *Wells v. Bailey,* Ky.App., 698 S.W.2d 841 (1985); *Stovall v. Dal-Camp, Inc.,* Ky.App., 669 S.W.2d 531 (1984).

Effective April 4, 1994, KRS 342.1202(2) was enacted, limiting the Special Fund's liability in all other injury claims.[7] The statute provided that:

> The special fund's liability for income benefits for all other injury claims shall not exceed fifty percent (50%) of the income benefits awarded for permanent disability. In those injury claims where the administrative law judge determines that the apportionment to the special fund under KRS 342.120 exceeds fifty

percent (50%) of the award of permanent disability, that portion of the award exceeding fifty percent (50%) shall be paid by the employer.

Effective December 12, 1996, KRS 342.1202 was repealed and the Special Fund's liability was abolished. KRS 342.120(2) provides that "[t]he special fund shall have no liability upon any claim in which the injury occurred, or for cumulative trauma, the disability became manifest, or, for occupational disease, if the date of injury or last exposure occurred, after December 12, 1996." At the same time, the Legislature amended KRS 342.0011(1) to specifically include the words, "cumulative trauma," in the definition of a compensable injury.

> "Injury" means any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings. "Injury" does not include the effects of the natural aging process, and does not include any communicable disease unless the risk of contracting the disease is increased by the nature of the employment. "Injury" when used generally, unless the context indicates otherwise, shall include an occupational disease and damage to a

---

whole or in part, on a pre-existing disease or pre-existing condition of the back or of the heart shall be apportioned, by the administrative law judge, fifty percent (50%) to the employer and fifty percent (50%) to the special fund. Apportionment required by this section shall not be a cause of appeal.

In 1990, the statute was amended and the word "permanent" was inserted before the words "total or partial disability." *Com., Cent. State Hosp. v. Gray,* 880 S.W.2d 557, 558 (Ky.1994).

7. In *Shoney's of London/Corbin v. Swafford,* 96–CA–2925 WC (Ky.App. Aug. 8, 1997), the claimant alleged carpal tunnel syndrome due to cumulative trauma, caused at least in part by her work at Shoney's. The ALJ found the claimant to be totally occupationally disabled and apportioned liability 60% to the Special Fund and 40% to the employer under *Southern Kentucky Concrete.* On appeal, the Court held that KRS 342.1202(2) controlled and mandated 50–50 apportionment, because the date of manifestation occurred after the statute's effective date.

prosthetic appliance, but shall not include a psychological, psychiatric, or stress-related change in the human organism, unless it is a direct result of a physical injury. . . .

However, KRS 342.610(1) was not amended. It provides that "[e]very employer subject to this chapter shall be liable for compensation for injury. . . ."

■ "[T]he law in effect on the date of injury or last injurious exposure is deemed to control . . . . an employer's obligations with regard to any claim arising out of and in the course of the employment." *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 93 (Ky. 2000). Here, the Board held that "the ALJ is left, then, with analyzing this as a cumulative trauma claim with multiple employers, and *Southern Kentucky Concrete* . . . is determinative." The Court of Appeals explained that *Southern Kentucky Concrete* stands "for the proposition that liability should be apportioned to the employer based upon the percentage of disability attributable to the work performed by the employee while in the employ of that company." But, a different version of KRS Chapter 342 was in effect when *Southern Kentucky Concrete* was decided. To hold that *Southern Kentucky Concrete* governs apportionment under the current statutory scheme is like applying the proverbial apples to oranges, and confuses liability with compensability.

*Land v. Burden*, 626 S.W.2d 221, 222 (Ky.App.1981) is illustrative. There, the old Board found the claimant to be permanently and totally disabled. Ten percent of his disability was pre-existing active and noncompensable. The remaining 90% compensable disability was found to have resulted entirely from the arousal of a preexisting dormant condition and liability was assessed against the Special Fund. The Special Fund then contends that since the injury . . . resulted in no liability for payment of compensation by [the] employer, it was therefore not a "subsequent compensable injury" within the meaning of the [then KRS 342.120], and, as a consequence, the Fund can have no liability for compensation. This contention confuses the statutory concept of "compensable injury" with the statutory provisions for who is liable to pay compensation. KRS 342.620(1) defines "injury" to be "any work related harmful change in the human organism(.)" KRS 342.610(1) provides that every employer subject to the Workers' Compensation Act "shall be liable for compensation for injury (.)" These statutes plainly make a work-related harmful change in the human organism a compensable injury with the employer liable for payment of any compensation due. KRS 342.120, on the other hand, shifts the liability for payment of the compensation. It does not render an otherwise compensable injury noncompensable.

*Id.* at 222 (citation omitted).

■ Since the 1996 amendments, what was once the Special Fund's liability has shifted back to the employer. "[T]he legislature's decision to abolish Special Fund apportionment with regard to traumatic injury claims had no effect on the longstanding principle that a harmful change to a worker's body that is caused by work is an "injury" for the purposes of Chapter 342." *Com., Transp. Cabinet v. Guffey*, 42 S.W.3d 618, 621 (Ky.2001). "[D]isability which results from the arousal of a prior, dormant condition by a work-related injury remains compensable under the 1996 Act. . . ." *McNutt Constr./First Gen. Servs. v. Scott*, 40 S.W.3d 854, 859 (Ky.2001). "Long ago, we determined that to the extent that a dormant degenerative condition, itself, is proximately caused by work, the condition is an injury. *See Haycraft v. Corhart Refractories*, Ky., 544

S.W.2d 222, 225 (1976). That principle remains viable under the 1996 amendments." *Hill v. Sextet Min. Corp.,* 65 S.W.3d 503, 508 (Ky.2001).[8]

Resurrecting the apportionment scheme of *Southern Kentucky Concrete* would in essence create a "lesser" class of claimants. In hearing loss and occupational disease claims—which are quite similar in nature to cumulative trauma because they occur gradually over time—the employer at the time of the last injurious or hazardous exposure is liable.[9] The employee is entitled to the same amount of compensation whether he worked for one employer or many. An employee who sustains a harmful change in his human organism due to cumulative trauma over many years working for the same employer is entitled to compensation to the full extent of his resultant disability. But, someone like Hale would not be fully compensated, simply because he worked for multiple employers. We can discern no basis for such a distinction. "Although both the employee and the employer have rights under the [Workers' Compensation] Act, the primary purpose of the law is to aid injured ... workers." *Zurich Am. Ins. Co. v. Brierly,* 936 S.W.2d 561, 563 (Ky.1996). Nothing in KRS Chapter 342 limits the liability of the employer, in whose employ the date of manifestation occurred, to the percentage of the claimant's work-life spent there. *Southern Kentucky Concrete* has no application under the current statutory scheme.

## B. Date of Manifestation

In cumulative trauma cases, a rule of discovery applies for establishing the date of injury.

In *Alcan Foil Products v. Huff,* [2 S.W.3d 96 (Ky.1999)]. ... [w]e determined that the obligation to give notice and the period of limitations for a gradual injury are triggered by a worker's knowledge of the harmful change and its cause rather than by the specific incidents of trauma that caused it. ...

The principles that *Alcan* addressed were refined in a number of subsequent cases, including *Hill v. Sextet Mining Corp.,* 65 S.W.3d 503 (Ky.2001)], in which we determined that a worker is not required to self-diagnose the cause of a harmful change as being a work-related gradual injury for the purpose of giving notice.

. . [N]othing prohibits a worker who thinks she has sustained a work-related gradual injury from reporting it to her employer before the law requires her to do so, and nothing prevents her from

---

**8.** We also note the Board's Opinion in *Danny Coleman v. Teco,* Claim No. 05–01356, rendered August 11, 2006, where it reversed the ALJ's apportionment of liability in a cumulative trauma case. There, the claimant had worked in the mines for 36 years; but only one and one-half years for Teco. Dr. Templin and Dr. Potter both attributed the cumulative trauma they diagnosed to the claimant's overall work history. On reconsideration, the ALJ determined that Teco was only liable for four percent of the compensation awarded, based upon the length of time the claimant had worked there. The Board reversed and explained that Teco was responsible for the entire award. Although the Special Fund previously shared liability with the last employer where the apportionment provisions of KRS 342.120 were properly implicated, "[s]ince the 1996 amendments to the Act, in cases involving cumulative trauma, what was once the liability of the Special Fund now falls to the employer...."

**9.** KRS 342.7305(4) provides that "the employer with whom the employee was last injuriously exposed to hazardous noise shall be exclusively liable for benefits."

KRS 342.316(1)(a) provides that "[t]he employer liable for compensation for occupational disease shall be the employer in whose employment the employee was last exposed to the hazard of the occupational disease."

reporting an injury that she thinks is work-related before a physician confirms her suspicion.

*Am. Printing House for the Blind ex rel. Mut. Ins. Corp. of Am. v. Brown,* 142 S.W.3d 145, 148–49 (Ky.2004).

The date of manifestation was not raised as an issue on appeal to the Board. Nevertheless, the Board determined that February 7, 2012, "does not comprise a date of manifestation. Therefore, the ALJ's determination Hale sustained a cumulative trauma injury which manifested on February 7, 2012 and the award of PTD benefits must be vacated." The Board instructed the ALJ to determine the date of manifestation on remand. The Court of Appeals affirmed.

The date of manifestation was never at issue before the ALJ. It was stipulated. The signed BRC Memorandum and Order reflects that the parties stipulated that "[Hale] sustained work-related injury(ies) on *2–7–12 (alleged).*" Neither party sought relief from the stipulation.[10] Although "causation" was listed as a contested issue, the parties did not include the date of manifestation among the contested issues in the signed BRC Memorandum and Order.[11]

In *Stewart v. Unifirst Corp.,* No.2006–SC–0396–WC, 2007 WL 542143, at *5 (Ky. Feb. 22, 2007), the parties had stipulated that the "plaintiff alleges a work related injury on January 10, 2002." But, payroll records showed that the plaintiffs last day of work was January 8, 2002. This Court explained that:

> Under the regulations, agreements contained in a signed BRC memorandum are the equivalent of a contract from which a party may not be released without a showing of cause.

The parties stipulated that, "The plaintiff allegedly suffered a work related injury on January 10, 2002." ... [Work-relatedness was] contested, but [the parties] did not include the alleged date of injury among the contested issues. Therefore, the legal effect of the stipulation was to establish the date of the alleged work-related injury. Because neither party moved to be released from the stipulation, they were bound by it. It relieved the claimant of the burden to prove the actual date of her injury and enabled the employer to base its defense on the agreed-upon date. Although the ALJ was free to judge the credibility of witnesses and to weigh conflicting evidence, the ALJ was not free to disregard the date to which they agreed.

Here, the ALJ properly found that the date of manifestation was February 7, 2012, because he was bound by the parties' stipulation. *Lappinen v. Union Ore Co.,* 224 Minn. 395, 29 N.W.2d 8, 17 (1947) ("As long as a stipulation remains in effect it is binding not only on the parties, but on both the trial and appellate court."); *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.,* 942 F.2d 1032, 1038 (6th

---

10. 803 KAR 25:010 Section 16(2) provides: "Upon cause shown, a party may be relieved of a stipulation if the motion for relief is filed at least ten (10) days prior to the date of the hearing, or as soon as practicable after discovery that the stipulation was erroneous."

11. 803 KAR 25:010 Section 13 provides in relevant part:

(13) If at the conclusion of the [BRC] the parties have not reached agreement on all the issues, the [ALJ] shall:
(a) Prepare a summary stipulation of all contested and uncontested issues which shall be signed by representatives of the parties and by the [ALJ]; ...

. . . .

(14) Only contested issues shall be the subject of further proceedings.

Cir.1991) ("Stipulations voluntarily entered by the parties are binding, both on the district court and on us."); *Double M Const., Inc. v. State Corp. Comm'n*, 288 Kan. 268, 202 P.3d 7, 10 (2009) ("Parties are bound to their stipulations, however, and a trial court or appellate court must render judgment based on those stipulated facts."); *Bruggner v. Shaffer*, 138 Ind.App. 183, 210 N.E.2d 439, 441 (1965) ("[F]acts which are stipulated . . . not having been set aside or withdrawn are conclusive upon the parties and the tribunal. . . . While the specific question of the stipulated facts was not raised in appellant's briefs, this court . . . is not so restricted that it must close its eyes to what is clearly before it.").

On appeal to the Court of Appeals, Hale argued that the Board impermissibly substituted its judgment for the ALJ's, but neither Hale, nor CDR, specifically raised the issue of the stipulation or the fact that the date of manifestation was not a contested issue before the ALJ. In the case at bar, Hale only broaches the issue in his combined Reply Brief and Response.

Ordinarily, this Court confines itself rather closely to deciding only those issues which the parties present. We take the view that counsel and the courts below have sufficiently identified the issues; that we need not redefine the question in the last stage of the litigation. However, we are constrained by no rule of court or constitutional provision to observe this procedure, and on rare occasions, the facts mandate a departure from the normal practice. When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law.

*Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991).

Although the Board held that the ALJ's determination as to the date of manifestation must be vacated, the Board has no authority to set aside a valid stipulation of fact, *sua sponte*.[12] Even if the ALJ's decision were vacated, the stipulation contained in the September 6, 2012 BRC Memorandum and Order remains in effect and is binding. The date of manifestation is February 7, 2012, as stipulated.

### C. Sufficiency of the Evidence to Establish a Cumulative Trauma Injury

CDR cross-appeals and contends that the evidence failed to establish that Hale sustained a cumulative trauma injury during his three-month employment there. The standard of review on appeal is whether the ALJ's decision is supported by substantial evidence. *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735, 736 (Ky.App.1984). The Board stated that the ALJ's determination was "certainly consistent" with Dr. Madden's opinion. The Court of Appeals concluded that there was sufficient evidence in the form of Dr. Madden's evidence to support the ALJ's finding that

12. KRS 342.285 provides in relevant part:

(2) The board shall not substitute its judgment for that of the administrative law judge as to the weight of evidence on questions of fact, its review being limited to determining whether or not:

(a) The administrative law judge acted without or in excess of his powers;

(b) The order, decision, or award was procured by fraud;

(c) The order, decision, or award is not in conformity to the provisions of this chapter;

(d) The order, decision, or award is clearly erroneous on the basis of the reliable, probative, and material evidence contained in the whole record; or

(e) The order, decision, or award is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Hale had sustained a cumulative work injury. We agree.

Dr. Madden evaluated Hale on May 17, 2012. His Form 107 report reflects that Hale had worked for more than 30 years operating heavy machinery. Chief complaints included low back pain and neck/upper back pain, both with bilateral radiculopathy. Dr. Madden noted that Hale's past medical history was significant for two injuries due to MVAs—a lumbar compression fracture in 2008 with subsequent kyphoplasty and a cervical fracture in the late 1980s. Dr. Madden reviewed medical records from Hale's primary care provider from 2004–2010 which suggest "a gradual progression of increasing neck and back problems due to chronic degenerative changes...." He also reviewed the report of a 2008 lumbar MRI which revealed lumbar degenerative disc disease, post traumatic changes with kyphoplasty due to L1 compression fracture, and the report of a 2010 CT scan of the head which was negative.

Dr. Madden's report details the findings of his physical exam.[13] He opined that within reasonable medical probability the plaintiff's injury was the cause of his complaints, and stated that the "patient is suffering from cumulative workplace trauma[.]" Dr. Madden explained that Hale "suffered cumulative workplace trauma over the course of many years, resulting in a cervical and lumbar disc disorder with radiculopathy that is consistent with the abnormal findings on exam." Dr. Madden noted that Hale has problems with activities of daily living due to his knee pain and restricted range of motion, and that his chronic osteoarthritic degenerative changes were certainly exacerbated by the cumulative, repetitive pedal motion driving a bulldozer. In his Form 107 report, Dr. Madden opined that Hale did not have any prior active impairment. He did not believe that Hale could return to heavy machine operation/bulldozing as a means of regular employment and felt that Hale would require permanent light-duty restrictions.[14]

In his deposition, Dr. Madden was asked if he could determine, within reasonable medical probability, whether the three-month period Hale operated a bulldozer at CDR would have contributed to his condition. Dr. Madden explained that he considered operating a bulldozer to be fairly significant trauma, noting that his father-in-law worked excavators and bulldozers. Dr. Madden testified that even three months, "[e]ven a short period of time— again, that straw that broke the camel's back scenario.... So yes, that could have occurred during that three month period."

CDR discusses Dr. Madden's deposition testimony regarding Hale's prior injuries and treatment; however, CDR did not appeal the ALJ's determination that Hale had no prior active disability.[15] CDR emphasizes that Dr. Madden did not review

13. Dr. Madden's findings included positive straight leg raising bilaterally at 25 degrees confirmed in the seated position, tenderness to palpation of the spinal musculature, chronic tissue texture changes, muscle guarding in the thoracolumbar junction and upper thoracics, consistent with reported trauma. There was asymmetrical and/or decreased range of motion in the lumbar and cervical spine, positive Spurling's test bilaterally, right worse than left, and left knee medial joint pain to palpation with crepitus noted, decreased passive flexion and tibial external rotation left.

14. In his amended Form 107 report, Dr. Madden assigned a whole person combined impairment rating of 30% 5th Ed. AMA Guides, comprised of DRE Lumbar category III—11%, DRE Cervical Category III—15% and knee impairment—8%.

15. *Parker Transfer v. Riley*, No.2004-SC-0822-WC, 2005 WL 2045490, at *2 (Ky. Aug. 25, 2005), explains, in its discussion of *Robert Bros.*, that a "properly-supported finding that no active disability existed at the time of the injury would preclude a finding that pre-exist-

any diagnostic studies performed after Hale starting working there. Neither did Dr. Primm, to whom CDR sent Hale for an IME, or Dr. Snider, who performed a records review for CDR. It is not apparent of record that any diagnostic studies were performed after Hale started working at CDR. It matters not.

KRS 342.0011(1), defining injury, requires "a harmful change in the human organism [to be] evidenced by objective medical findings." KRS 342.0011(33) defines objective medical findings as "information gained through direct observation and testing of the patient applying objective or standardized methods[.]"

In *Gibbs v. Premier Scale Co./Indiana Scale Co.*, 50 S.W.3d 754, 762 (Ky.2001), this Court explained:

> [We are not persuaded that] a harmful change must be, or is capable of being, documented by means of sophisticated diagnostic tools such as the x-ray, CAT scan, EEG, or MRI in order to be compensable. . . . Likewise, we are not persuaded that a harmful change must be both directly observed and apparent on testing in order to be compensable as an injury.

We know of no reason why the existence of a harmful change could not be established, indirectly, through information gained by direct observation and/or testing applying objective or standardized methods that demonstrated the existence of symptoms of such a change. Furthermore, we know of no reason why a diagnosis which was derived from symptoms that were confirmed by direct objective and/or testing applying objective standardized methods would not comply with the requirements of KRS 342.0011(1).

The requirement of "objective medical findings" only applies to the harmful change, not to causation. "Although KRS 342.0011(1) clearly requires that there be objective medical findings of a harmful change in the human organism in order for that change to be compensable, we are not persuaded that KRS 342.0011(1) requires causation to be proved by objective medical findings." *Staples, Inc. v. Konvelski*, 56 S.W.3d 412, 415–16 (Ky.2001).

The ALJ has "the right to believe part of the evidence and disbelieve other parts of the evidence whether it came from the same witness or the same adversary party's total proof." *Caudill v. Maloney's Disc. Stores*, 560 S.W.2d 15, 16 (Ky.1977). We agree with the Court of Appeals that Dr. Madden's opinion provides a sufficient evidentiary foundation to support the ALJ's decision.

### III. CONCLUSION

Accordingly, the decision of the Court of Appeals is affirmed in part and reversed in part, and the decision of the ALJ is reinstated.

All sitting. Cunningham, Keller, Noble, and Venters, JJ., concur. Minton, C.J., concurs in result only by separate opinion in which Abramson, J., joins.

MINTON, C.J., CONCURRING IN RESULT ONLY:

I concur in today's result; but I believe the majority opinion mischaracterizes February 7, 2012, as the "stipulated date" that Hale's injury manifested. A close look at the record renders this assertion ambiguous at best, and that—coupled with the fact that this rather significant finding has eluded the keen eye of administrative and

---

ing impairment accounted for a pre-existing disability and would imply a finding that work-related impairment, by itself, was totally disabling." Here, the ALJ found that there was no active disability, because Hale was working without restrictions, despite his previous injuries and painful spinal symptoms, during the time he was employed by CDR.

judicial reviewers at every level—causes me to reject the majority's finding on that point. But because I am not persuaded that using Hale's lay-off date as the date of manifestation (and, thus, the date of discovery) would change the outcome of this case, this is a harmless mistake.

Ultimately, I think there is enough in the ALJ's opinion to qualify for deference under the substantial-evidence standard of review. Dr. Madden testified that three decades of jolting labor as a bulldozer operator gave rise to the cumulative trauma that resulted in Hale's disability. CDR employed Hale to continue his job as a bulldozer operator—the same work activity that Dr. Madden felt caused Hale's cumulative-trauma injury. Although evidence in this record establishing proximate causation certainly is not extensive, there is just enough to find that the ALJ's conclusion linking CDR to Hale's claim was supported by substantial evidence.

As for the issue of apportioning CDR's liability for Hale's injury, I am troubled with the result. But the majority appropriately framed the current state of our law. In light of the dissolution of the Special Fund, we can no longer give effect to *Southern Kentucky Concrete* and its rule of apportionment. And although I am concerned that an employer of three months may foot the bill for thirty years of gradual trauma, this Court is left with no choice under the current workers' compensation law. I am also doubtful that this is the result that the General Assembly intended with the workers' compensation statutory scheme; but until the text is modified, I have no alternative other than to concur in today's result.

Abramson, J., joins.